UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

JANE DOE, on her own behalf and on behalf of her minor son, BABY DOE,

        Plaintiff,

    -against-

THE CITY OF NEW YORK, NEW YORK CITY POLICE DEPARTMENT ("NYPD") DETECTIVE MICHAEL FRANCO, NYPD OFFICER GUANDONG E, NYPD OFFICER MICHAEL GARCIA, NYPD OFFICER BARBARA KULICK, NYPD OFFICER CHRISTOPHER MCALEESE, NYPD OFFICER DEYONCA RICHARDS, NYPD OFFICER MAXIMO AGRONT, NYPD OFFICER MUHAMMED ALI, AND NYPD OFFICERS JOHN JOE 1-2,

        Defendants.

No. 20 Civ. 1344

**AMENDED COMPLAINT
AND JURY DEMAND**

Plaintiff Jane Doe, on her own behalf and on behalf of her minor son, by and through her attorneys, the Legal Aid Society and Emery Celli Brinckerhoff Abady Ward & Maazel LLP, for her Complaint alleges as follows:

## PRELIMINARY STATEMENT

1. This case is about the New York City Police Department's shocking, inhumane, and barbaric treatment of Plaintiff Jane Doe, who was arrested and handcuffed when she was more than 40 weeks pregnant, denied appropriate medical treatment for hours, and forced to labor and then care for her newborn son in shackles.

2. In the early morning hours of December 17, 2018, officers of the New York City Police Department ("NYPD") went to Ms. Doe's home and banged on her door, rousing her from sleep. Ms. Doe was 21 years old. When Ms. Doe answered the door in her

pajamas, the NYPD arrested her. At the time of her arrest, Ms. Doe was 40 weeks and 2 days pregnant—past her due date. The NYPD arresting officers knew that Ms. Doe was extremely pregnant, remarking on it to her as they took her into custody. There was no urgent need to arrest Ms. Doe that day; she was charged for an incident related to a family dispute with her mother's boyfriend, an incident that had allegedly occurred more than a week earlier and the charge for which was later dismissed in its entirety.

3. The NYPD then proceeded to transport Ms. Doe—who was visibly 40 weeks pregnant—from her mother's home to the 9th Precinct to Manhattan Criminal Court and then back to the 9th Precinct. After many hours in custody and transport, NYPD officers then transferred Ms. Doe to the 75th Precinct in Brooklyn. Defendants detained Ms. Doe at the 75th Precinct for many hours in a cell, ignoring her obvious need for medical treatment and leaving her alone as they celebrated at a holiday party, even though they knew she was days past her due date and was evidently experiencing contractions. Even though Defendants knew that she was in labor, they delayed and denied Ms. Doe access to medical care.

4. Late at night on December 17, 2018, after laboring alone in a holding cell for hours, and after a medically untrained police officer attempted to inspect Jane Doe's vaginal area, Ms. Doe was finally taken from the police station to Kings County Hospital. When Defendants transported her from the 75th Precinct to Kings County Hospital in an ambulance, they shackled her arm to the gurney in the ambulance, while she was in active labor and in tremendous pain.

5. At Kings County Hospital, Defendants continued to shackle Ms. Doe at her wrists and ankles. Despite requests from the nursing staff, the NYPD refused to remove the shackles, compelling Ms. Doe to labor in excruciating pain while shackled. Ms. Doe was

physically exhausted after a day and night in police custody. She struggled with her labor. Moments before Ms. Doe delivered her son, the need for an epidural finally compelled the NYPD to briefly remove her shackles. At approximately 6:00 a.m. on December 18, Ms. Doe gave birth to her son.

6.      Shortly after she gave birth, NYPD officers again shackled Jane Doe to the bed, ignoring the nurses' continued requests to leave her unrestrained. Ms. Doe struggled to feed her new baby with one arm and to move safely about. Defendants then forced Ms. Doe to remain in shackles until she was arraigned the following day, as she tried to recover from the birth, address problematic blood clotting by walking around, and care for her son.

7.      "Shackling" is the dehumanizing and dangerous practice of using restraints on a pregnant woman in custody during her transportation, labor, delivery, and/or recovery. Medical and correctional experts are unanimous that shackling pregnant women is an unnecessary and humiliating procedure. It is a serious threat to the health of the mother and child. Shackling pregnant women is also unlawful. Between 2009 and 2015, New York State banned the use of *any* restraints on pregnant women absent the most extraordinary of circumstances.

8.      While she was in the NYPD's custody, Jane Doe never struggled, resisted, or acted in any way that would even remotely support the use of restraints. Ms. Doe was terrified for herself and for her baby. She feared that she would deliver the baby alone in a cell in the 75th Precinct without medical help. She feared that after she gave birth, the NYPD would take her baby away. She desperately wanted her family and her partner's family to be present for the birth of her son, at her chosen hospital, consistent with her birth plan. But she remained compliant, urging herself to stay calm for the safety of her baby. For months after she left the hospital, Ms.

Doe felt tearful and depressed as she remembered the horrific circumstances she was forced to endure.

9. This is a civil rights case about the egregious failure of the NYPD to protect the health, safety, and dignity of a woman at one of the most important and vulnerable moments in her life. Many NYPD personnel—officers and a supervisor—encountered Jane Doe between December 17 and December 19, 2018. Defendants participated in, approved of, or failed to prevent the unconstitutional, illegal, and cruel shackling of Ms. Doe—even as she labored, immediately after she gave birth, and while she cared for her new baby with one arm handcuffed to her hospital bed.

10. Plaintiff Jane Doe seeks damages pursuant to 42 U.S.C. § 1983 for Defendants' violations of her rights under the United States Constitution and under New York law. She also seeks changes to the NYPD's policies to ensure that the NYPD will never shackle a pregnant woman in its custody again. Shackling is a dehumanizing, cruel, and pointless practice that has no place in New York City.

## THE PARTIES

11. Plaintiff Jane Doe is a citizen of the United States and at all relevant times was a resident of the Bronx or Manhattan, New York.

12. Defendant City of New York ("City") is a municipality organized and existing under the laws of the State of New York. At all relevant times, the City, acting through the New York City Police Department ("NYPD"), was responsible for the policy, practice, supervision, implementation, and conduct of all NYPD matters, including the appointment, training, supervision, and conduct of all NYPD personnel. In addition, at all relevant times, the

City was responsible for enforcing the rules of the NYPD and ensuring that NYPD personnel obey the laws of the United States and the State of New York.

13.     Defendant Detective Michael Franco, Tax# 940158, was at all times relevant hereto a detective of the NYPD, acting in the capacity of agent, servant, an employee of Defendant City, and within the scope of his employment as such.

14.     Defendant Supervisor Officer John Joe 1 is a White, heavyset male who wore a white shirt and was on duty at the desk at the NYPD's 75th Precinct in Brooklyn ("75th Precinct") at approximately 3:00 p.m. on December 17, 2018.

15.     Defendant Officer Guandong E, Tax #955896, was at all times relevant hereto an officer of the NYPD, acting in the capacity of agent, servant, an employee of Defendant City, and within the scope of his employment as such.

16.     Defendant Officer Michael Garcia, Tax #940174, was at all times relevant hereto an officer of the NYPD, acting in the capacity of agent, servant, an employee of Defendant City, and within the scope of his employment as such.

17.     Defendant Officer Barbara Kulick (*nee* Maier) was at all times relevant hereto an officer of the NYPD, acting in the capacity of agent, servant, an employee of Defendant City, and within the scope of her employment as such.

18.     Defendant Officer Christopher Mcaleese was at all times relevant hereto an officer of the NYPD, acting in the capacity of agent, servant, an employee of Defendant City, and within the scope of his employment as such.

19.     Defendant Officer Deyonca Richards was at all times relevant hereto an officer of the NYPD, acting in the capacity of agent, servant, an employee of Defendant City, and within the scope of her employment as such.

20.     Defendant Officer Maximo Agront was at all times relevant hereto an officer of the NYPD, acting in the capacity of agent, servant, an employee of Defendant City, and within the scope of his employment as such.

21.     Defendant Officer Muhammed Ali was at all times relevant hereto an officer of the NYPD, acting in the capacity of agent, servant, an employee of Defendant City, and within the scope of his employment as such.

22.     Defendant Officer John Joe 2 was at all times relevant hereto an officer of the NYPD, acting in the capacity of agent, servant, an employee of Defendant City, and within the scope of his employment as such. He relieved Defendant Officer Ali at approximately 8:50 a.m. on December 19, 2018, and guarded Ms. Doe at Kings County Hospital until her arraignment on the same day.

## JURISDICTION AND VENUE

23.     This action arises under the Fourth and Fourteenth Amendment to the United States Constitution, 42 U.S.C. §§ 1983 and 1988, and New York state law.

24.     The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343(a)(3) and (4), and 1367(a).

25.     A substantial part of the acts complained of occurred in the Eastern District of New York, and venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b).

## JURY DEMAND

26.     Plaintiff demands trial by jury.

## FACTUAL ALLEGATIONS

**A.     Officers from the 9th Precinct Arrest Plaintiff When She is 40 Weeks Pregnant**

27.     Plaintiff Jane Doe is a twenty-two-year-old woman. She lives in Manhattan with her family. She identifies as African American.

28.     On December 17, 2018, Ms. Doe was over 40 weeks pregnant and had passed her due date, which fell on December 15, 2018.

29.     In the months leading up to her due date, Ms. Doe received prenatal care from her obstetrician at Mt. Sinai West Hospital. Ms. Doe planned to deliver her baby at that hospital under her obstetrician's care, and with her family and her partner's family by her side.

30.     On December 15, 2018, at approximately 7:05 p.m., Ms. Doe visited New York Presbyterian Hospital because she was experiencing contractions and had begun the early stages of labor. The staff at New York Presbyterian Hospital did not admit Ms. Doe because she was not sufficiently dilated to be admitted to the hospital for delivery.

31.     In the early morning hours of December 17, 2018, Detective Lauren O'Rourke, along with Police Officer Marciano  from the NYPD's 9th Precinct in Manhattan, New York ("9th Precinct") arrived at Ms. Doe's mother's home in Manhattan.

32.     Detective O'Rourke arrested Ms. Doe based on an investigative card (also known as an "I-Card") regarding an alleged altercation between Ms. Doe and her mother's then-boyfriend that had occurred one week earlier, on December 10, 2018 (the "2018 I-Card").

33.     There was no urgent need to arrest Ms. Doe that morning; the incident underlying the 2018 I-Card had occurred on December 10, 2018, more than a week earlier, and no further action had been taken by the police in those intervening days.

34.     After her arrest, officers brought Ms. Doe to the 9th Precinct and detained her there until approximately 7:00 a.m., when Defendant Detective Michael Franco took Ms. Doe to Manhattan Criminal Court.

35.     Ms. Doe was arraigned at Manhattan Criminal Court and released with no bail set. The charges on which she was arrested by the officers from the 9th Precinct were ultimately dismissed.

**B.     Defendant Franco Arrests and Confines Jane Doe Without Probable Cause**

36.     After Jane Doe was arraigned, Detective Franco informed her for the first time that she was the subject of another I-Card, which had been submitted more than a year earlier, in November 2017, by Officer Christopher Robley of the NYPD's 75th Precinct in Brooklyn, New York ("75th Precinct"), in connection with a misdemeanor charge concerning a dispute between Ms. Doe and a foster family member (the "2017 I-Card").

37.     Since at least 2007, the NYPD has used an internal system, the "Computerized Investigation Card System," to log people who are potentially connected to open allegations of crime and to arrest some of them. The NYPD Patrol Guide explicitly directs officers to detain and arrest people based on the issuance of an I-Card.

38.     I-Cards are not independently scrutinized by a magistrate or judge to determine whether probable cause exists before granting any NYPD officer the power to effectuate an arrest.

39.     The 2017 I-Card therefore was not independently scrutinized by a magistrate or judge to determine whether probable cause existed to arrest Ms. Doe on the allegations underlying it.

40.     Although he had ample opportunity during the thirteen months that elapsed between the submission of the 2017 I-Card and December 17, 2018, Officer Robley never sought or obtained a warrant to arrest Ms. Doe based on the allegations underlying the 2017 I-Card.

41.     At no time prior to December 17, 2018 did any NYPD officer seek or obtain a warrant to arrest Ms. Doe based on the allegations underlying the 2017 I-Card.

42.     For at least eleven months prior to Ms. Doe's December 17, 2018 arrest, the NYPD made no attempt to locate Ms. Doe, or to contact her or her lawyer to ask that she surrender herself for the charge underlying the 2017 I-card.

43.     The NYPD's decision to arrest Ms. Doe on the non-emergency allegations underlying the 2017 I-Card when she was 40 weeks and 2 days pregnant, after failing to request that she surrender herself for eleven months, shocks the conscience.

44.     The 2017 I-Card did not include any information about the facts purportedly giving rise to probable cause to arrest Ms. Doe.

45.     The 2017 I-Card did not identify the origin of the complaint underlying the I-Card.

46.     The 2017 I-Card did not include any information suggesting that Officer Robley or any other officer investigated any witness complaint concerning the facts underlying the 2017 I-Card.

47.     Based only on the 2017 I-Card, Detective Franco arrested Ms. Doe and transported her, against her will, back to the 9th Precinct, where she was detained until officers from the 75th Precinct arrived to take her into their custody.

48.     Detective Franco detained Ms. Doe on the 2017 I-Card despite the fact that she was more than 40 weeks pregnant and the fact that the NYPD's records reflect an entry on the morning of her arrest that: "DEFT REJECTED BY DOC DUE TO PREGNANCY. DEFT IS PREGNANT FOR 40 WEEKS, DEFT HAS A HIGH RISK PREGNANCY. DEFT IS DESIGNATED A WALK-THRU."

49.     Detective Franco did not have probable cause to arrest Ms. Doe for any crime based on the 2017 I-Card, including because he did not communicate with Officer Robley or take any other steps to verify the information on the I-Card, which had been generated more than a year earlier.

50.     Prior to arresting Ms. Doe, neither Detective Franco nor any other officer from the 9th Precinct was involved in the investigation of the allegations underlying the 2017 I-Card.

51.     Prior to arresting Ms. Doe, Detective Franco did not contact Officer Robley to confirm that the facts underlying the 2017 I-Card gave rise to probable cause to arrest Ms. Doe.

52.     At no time during her transport between Manhattan Criminal Court and the 9th Precinct did Ms. Doe resist any officer, nor did she refuse to comply with any commands.

## C.     Defendant Officers Transport Jane Doe to the 75th Precinct and Confine Her in a Holding Cell for Many Hours

53.     Sometime later, Officer Nicholas Kester and Detective Stephens from the NYPD's 75th Precinct arrived at the 9th Precinct to take Ms. Doe into their custody and transport her to the 75th Precinct.

54.     At no time during her transport to the 75th Precinct did Ms. Doe resist any Defendant Officer, nor did she refuse to comply with any commands.

55.     Ms. Doe arrived at the 75th Precinct at approximately 2:30 p.m. on December 17, 2018.

56.     At approximately 2:35 p.m., Ms. Doe encountered Sergeant Cankul, a supervisor on duty, who verified that she was forty weeks and two days pregnant.

57.     Shortly after Ms. Doe arrived at the 75th Precinct, she encountered Defendant Supervisor Officer John Joe 1. John Joe 1 noticed that Ms. Doe was pregnant and asked her for her due date. Ms. Doe responded that it was December 15, 2018, and John Joe 1 noted, "You're already two days past your due date." Ms. Doe was placed in a holding cell and left alone. She was already in the early stages of labor and had experienced contractions.

58.     During the time Ms. Doe was detained in the holding cell, Defendant Officer Guandong E was sitting at a desk near the holding cell. Defendant Officer Michael Garcia later took Defendant E's place sitting near the holding cell.

59.     Ms. Doe experienced contractions while she sat in the holding cell.

60.     One of the other detainees attempted to measure how much time passed between contractions and noted her surprise that none of the officers were assisting Ms. Doe or helping her obtain medical care.

61.     While she labored in the holding cell, Ms. Doe could hear noises coming from a holiday party being held in the 75th Precinct for NYPD staff.

62.     Although at some point Ms. Doe notified Defendant Officers E and Garcia that she was in labor, although Ms. Doe was visibly 40 weeks pregnant, and although she was visibly having contractions, from the time Ms. Doe arrived at the 75th Precinct at approximately 3:00 p.m. until approximately 11:00 p.m., no Defendant Officer asked her if she required medical care, nor did any Defendant Officer take any other steps to determine what medical care she required.

63.     During the time Ms. Doe was detained in a holding cell, other detainees were smoking in a nearby cell. Ms. Doe was aware of the health risks associated with the

inhalation of secondhand smoke by pregnant women, and she became concerned about the health of her baby.

64.     Notwithstanding the medical risks to Ms. Doe and her baby, no Defendant Officer directed the other detainees to stop smoking. To the contrary, Defendant Officers E and Garcia, on separate occasions, provided cigarettes to another detainee, which she smoked in Ms. Doe's presence.

65.     At some point, a female officer, Defendant Officer Barbara Kulick, came to Ms. Doe's holding cell.

66.     After Ms. Doe informed Officer Kulick that she was in pain and in need of medical care, Officer Kulick ordered Ms. Doe to lie on a bench in the holding cell so she could conduct an "inspection."

67.     Officer Kulick then ordered Ms. Doe to remove her pants, including her undergarments.

68.     Ms. Doe objected because Officer Kulick was not a doctor and was not qualified to conduct an "inspection." But Officer Kulick insisted, and Ms. Doe complied because she believed that Officer Kulick would not grant her access to professional medical care unless she submitted to this humiliating procedure.

69.     After Ms. Doe pulled down her pants and undergarments, Officer Kulick inspected Ms. Doe's vaginal area.

70.     Officer Kulick callously told Ms. Doe that she was "crowning" and joked that she had been trained to deliver babies and "would deliver your baby right now."

71. On information and belief, Officer Kulick had not received training in delivering babies and was not qualified or authorized to perform any "inspections" for medical purposes, or to deliver babies in the absence of an emergency.

72. At approximately 11:00 p.m., after Officer Kulick conducted the "inspection," and after Ms. Doe had been forced to labor at the 75th Precinct for approximately eight hours, an ambulance was called to transport Ms. Doe to a hospital.

73. At no point during her detention at the 75th Precinct did any of the Defendant Officers reasonably believe that Ms. Doe was a risk of harm to herself or to others, or that she was a flight risk.

74. At no time during her detention at the 75th Precinct did Ms. Doe resist any Defendant Officer or refuse to comply with any commands.

75. Although Ms. Doe was in labor during her detention at the 75th Precinct, no Defendant Officer offered or provided her water, instead providing only a single meal of Chinese takeout food and a soda.

76. During the time that she was detained at the 75th Precinct, Ms. Doe was dehydrated because the Defendant Officers there did not provide her with any water.

**D.      Defendants Transport Jane Doe to Kings County Hospital Handcuffed to the Ambulance Bed and Shackled Her Throughout Her Labor**

77. Sometime after 11:00pm on December 17, 2019, Defendant Officer Christopher Mcaleese accompanied Jane Doe in an ambulance to Kings County Hospital.

78. During the ambulance ride, Officer Mcaleese handcuffed Ms. Doe to the ambulance gurney.

79. At the time Officer Mcaleese handcuffed Ms. Doe's arm to the ambulance bed, he knew that Ms. Doe was 40 weeks pregnant and that she was in active labor.

80. During the ambulance ride, Ms. Doe was in severe physical discomfort. The handcuffs prevented her from alleviating the intense pain of labor because she could not lie on her side. She was verbalizing that she was in extreme pain.

81. Notwithstanding Ms. Doe's screams of pain, Officer Mcaleese refused to remove her handcuffs.

82. Ms. Doe arrived at Kings County Hospital sometime between 12:00 a.m. and 1:00 a.m. on December 18, 2018.

83. By the time Ms. Doe arrived at Kings County Hospital, she was six centimeters dilated.

84. After Ms. Doe arrived at Kings County Hospital, she continued to be handcuffed to the ambulance bed while she was transported from the ambulance to a triage room.

85. Shortly after Ms. Doe arrived at Kings County Hospital, at least one nurse informed Officer Mcaleese that the use of restraints on Ms. Doe while she was in labor was dangerous both to Ms. Doe and to her baby.

86. At least one nurse asked Officer Mcaleese to remove the handcuffs, but he refused, asserting that he was just following an unspecified "protocol" and was just "doing his job."

87. Ms. Doe remained handcuffed to the hospital bed in the triage room for several hours. Officer Mcaleese remained posted just outside the triage room.

88. Because Officer Mcaleese refused to remove the handcuffs, hospital staff were forced to provide medical care, such as checking Ms. Doe's vital signs and monitoring her dilation levels, while Ms. Doe was in restraints.

89.     Ms. Doe's restraints were removed briefly for medical personnel to conduct blood work.

90.     After Ms. Doe was transferred to a delivery room, she was again handcuffed to her hospital bed, and Officer Mcaleese again sat guard just outside the room.

91.     Officer Mcaleese refused to remove Ms. Doe's handcuffs while she was in the delivery room. He finally agreed to remove them after nurses informed him that Ms. Doe needed to begin pushing and that the handcuffs were preventing her from receiving an epidural.

92.     Officer Mcaleese had to enter the delivery room to remove the handcuffs, invading Ms. Doe's privacy during one of the most vulnerable moments of her life.

93.     Ms. Doe was forced to deliver her son, "Baby Doe," alone without family members present. The Defendant Officers denied her the presence of her family members, her partner's family members, and her obstetrician, by preventing her from timely notifying them of the time and location of her anticipated delivery.

94.     Defendant Officers informed Ms. Doe's family members and her partner's family members that in order to visit Ms. Doe and later Baby Doe at Kings County Hospital, they needed to first visit the 75th Precinct, in person, to obtain a permission letter.

95.     Officers at the 75th Precinct informed Ms. Doe's family members and her partner's family members that they could not obtain a permission letter until the following morning, forcing Ms. Doe to labor and deliver her son alone.

E.     **Jane Doe Gives Birth to Her Son on December 18, 2018**

96.     Ms. Doe gave birth to a baby boy, Baby Doe, at approximately 6:00 a.m. on December 18, 2018, with Officer Mcaleese still stationed just outside the delivery room.

97.     During her labor and delivery, Ms. Doe was physically exhausted and drained from the hours in police custody, in shackles, without adequate food or sleep. She struggled to summon her energy for the delivery.

98.     Both Ms. Doe and her newborn son had fevers during the period immediately following Baby Doe's birth.

99.     Ms. Doe feared that the fevers were a result of her shackling.

100.    Shortly after delivery, Ms. Doe fed her newborn son, and she fell asleep with him on her chest.

101.    While Ms. Doe was still asleep, at approximately 8:30 a.m.—merely hours after she had given birth—Officer Deyonca Richards, entered the room, demanded that Ms. Doe be handcuffed and shackled to the hospital bed, and proceeded to handcuff and shackle Ms. Doe to the hospital bed.

102.    Officer Richards was aware that Ms. Doe had just given birth to her baby at the time she applied handcuffs to Ms. Doe's arm and shackles to her ankle.

103.    Before Ms. Doe's family members arrived, Officer Richards repeatedly told Ms. Doe that if she could not find a family member to take care of Baby Doe when Ms. Doe was required to return to court for arraignment, representatives from the Administration for Children's Services ("ACS") would take him into their custody.

104.    Ms. Doe immediately began to cry; she was terrified by Officer Richards's threat that ACS would seize her newborn son within hours of his birth.

105.    Ms. Doe was kept shackled to her bed, limiting her ability to hold and tend to her newborn child. She struggled to feed her son using just one arm.

106. Sometime later, Baby Doe was transferred to the NICU because of distress and jaundice.

107. Ms. Doe feared that Baby Doe's distress and jaundice were a result of her shackling.

108. Later in the morning on December 18, 2018, nurses discovered that Ms. Doe had blood clots, and they suspected that the clots could have been caused by Ms. Doe's restraints.

109. Officer Richards only briefly removed the shackles while a nurse assessed Ms. Doe's condition. As soon as the nurse was finished, Officer Richards placed Ms. Doe back into restraints.

110. At least one nurse told Officer Richards to remove the restraints because Ms. Doe needed to ambulate, or walk, in order to prevent further blood clotting, and because Ms. Doe needed to go to the NICU to bond with her newborn son.

111. In response, Officer Richards removed the restraints attaching Ms. Doe to the bed, but then shackled Ms. Doe's ankles together.

112. During Ms. Doe's medically necessary ambulation around the hospital, the ankle shackles made it difficult to walk and created a risk that she would trip and injure herself.

113. Ms. Doe nearly tripped on several occasions as she walked around the hospital floor in ankle shackles.

114. When Ms. Doe's grandmother asked Officer Richards why the restraints were necessary, Officer Richards responded that if she removed the restraints, she could "get in trouble" with her superiors.

115.     At approximately 4:15 p.m., Defendant Officer Maximo Agront relieved Officer Richards.

116.     When Officer Agront relieved Officer Richards, Ms. Doe was still handcuffed and shackled to the hospital bed. Officer Agront was aware that Ms. Doe had just given birth to Baby Doe.

117.     At various times during the period that Officer Agront guarded Ms. Doe, he placed her in handcuffs and leg shackles.

118.     At approximately 12:30 a.m. on December 19, 2018, Defendant Officer Muhammed Ali relieved Officer Agront, Officer Ali was aware that Ms. Doe had just given birth to Baby Doe.

119.     At various times during the period that Officer Ali guarded Ms. Doe, he placed her in handcuffs and leg shackles.

120.     At approximately 8:50 a.m. on December 19, 2018, Defendant Officer John Joe 2 relieved Officer Ali. Officer John Joe 2 was aware that Ms. Doe had just given birth to Baby Doe.

121.     At various times during the period that Officer John Joe 2 guarded Ms. Doe, he placed her in handcuffs and leg shackles.

122.     On or around December 19, 2018, Ms. Doe was finally assigned a criminal defense attorney.

123.     At approximately 10:15 a.m., two court officers arrived at the hospital to conduct a video arraignment of Ms. Doe on the case related to the 2017 I-card arrest.

124.     After Ms. Doe's attorney asked for the restraints to be removed, one of the court officers instructed John Joe 2 not to remove the restraints until after Ms. Doe had been

arraigned because he did not want the judge to see that they were not complying with some unspecified "policy."

125.     After the arraignment, at approximately 10:45 a.m. on December 19, 2018, Ms. Doe was finally released from her restraints.

126.     On or about December 20, 2018, Ms. Doe and Baby Doe were discharged from Kings County Hospital.

127.     Even when Ms. Doe was able to be with Baby Doe, the Defendant Officers deprived her of the opportunity to fully bond with her newborn son in their first days together by unnecessarily handcuffing, shackling, and constantly surveilling her.

128.     At no point during her stay at Kings County Hospital did any of the Defendant Officers reasonably believe that Ms. Doe was a risk of harm to herself or to others, or that she was a flight risk.

129.     At no time during her stay at Kings County Hospital did Ms. Doe resist any Defendant Officer or refuse to comply with any commands.

**F.     New York State Ends the Abhorrent Practice of Shackling Pregnant Women**

130.     Medical experts, correctional experts, and maternal and fetal health experts unanimously agree that pregnant women should not be shackled absent the most extraordinary circumstances. Such extraordinary circumstances are limited to situations where a woman poses a risk of injury to herself or others that cannot be addressed by less restrictive means.

131.     Shackling poses a substantial risk of harm to a pregnant woman's health, and to the health and safety of the baby, at any stage of pregnancy.

132.     The American Medical Association, the Federal Bureau of Prisons, the U.S. Marshals Service, the American Correctional Association, the American College of

Obstetricians and Gynecologists, and the American Public Health Association all oppose shackling pregnant women during labor, delivery, and postpartum recovery.

133.    The American Medical Association issued a policy against shackling in 2010. The AMA found that shackling increased the potential for harm to the woman and baby, that "freedom from physical restraints is especially critical during labor, delivery, and postpartum recovery," and that "restraints on a pregnant woman can interfere with the medical staff's ability to appropriately assist in childbirth or to conduct sudden emergency procedures."[1]

134.    The American College of Obstetricians opined in 2011 that the use of restraints on pregnant women compromises health care, is demeaning, and is rarely necessary.[2]

135.    Shackles interfere with healthcare providers' ability to conduct necessary tests to ensure the safe and healthy progression of a pregnancy.[3]

136.    Shackling can exacerbate a pregnant woman's already-compromised balance while she is standing or walking, increasing the risk of falls that can injure not only the mother, but also the fetus.[4]

137.    The use of shackles on a pregnant woman in labor can inhibit successful cervical dilation, unnecessarily prolonging her labor.[5]

---

[1] AM. MED. ASS'N, AN "ACT TO PROHIBIT THE SHACKLING OF PREGNANT PRISONERS" MODEL STATE LEGISLATION 1 (2010).

[2] AM. COLL. OF OBSTETRICIANS AND GYNECOLOGISTS, HEALTH CARE FOR PREGNANT AND POSTPARTUM INCARCERATED WOMEN AND ADOLESCENT FEMALES 3 (2011).

[3] Amanda Glenn, *Shackling Women During Labor: A Closer Look at the Inhumane Practice Still Occurring in Our Prisons*, 29 HASTINGS WOMEN'S L.J, 199, 202 (2018).

[4] ACLU Reproductive Freedom Project & ACLU National Prison Project, *ACLU Briefing Paper: The Shackling of Pregnant Women & Girls in U.S. Prisons, Jails & Youth Detention Centers* 3 (2012), https://www.aclu.org/files/assets/anti-shackling_briefing_paper_stand_alone.pdf (hereafter, "ACLU Briefing Paper").

[5] *See* Glenn, *supra*, n.3.

138. Women often need to move around during labor, delivery, and recovery to manage pain and avoid complications, including moving their legs as part of the birthing process. Shackling limits a woman's ability to shift positions to manage the extreme pains of labor and childbirth. This can, in turn, decrease the flow of oxygen to the fetus, endangering the health of both the mother and the unborn child.

139. Shackling women during labor can lead to bruising from leg and abdomen restraints. Leg restraints can also cause severe cuts on women's ankles because of the strains associated with childbirth.[6]

140. When restraints are used during labor, doctors are limited in how they can manipulate the mother's body for the safety of the unborn child.

141. During the final stages of labor, it is particularly important for the physician to act quickly to avoid potentially life-threatening emergencies for both the mother and the unborn child. Shackles severely limit physicians' abilities to provide such emergency care, threatening maternal and fetal health.[7]

142. Using restraints after delivery may prevent mothers from effectively healing and breast-feeding. It also puts new mothers at "substantial risk of thromboembolic disease and postpartum hemorrhage."[8]

143. In addition to posing serious health risks to a mother and baby, shackling is almost never justified for security reasons.

---

[6] *ACLU Briefing Paper* at 3.

[7] AMNESTY INT'L, ABUSE OF WOMEN IN CUSTODY: SEXUAL MISCONDUCT AND THE SHACKLING OF PREGNANT WOMEN 23 (2001).

[8] UNIV. OF CHICAGO L. SCH. – INT'L HUMAN RIGHTS CLINIC, THE SHACKLING OF INCARCERATED PREGNANT WOMEN: A HUMAN RIGHTS VIOLATION COMMITTED REGULARLY IN THE UNITED STATES 6 (2014), https://chicagounbound.uchicago.edu/cgi/viewcontent.cgi?article=1008&context=ihrc.

144.     Among the states that have restricted the shackling of pregnant prisoners, none has documented instances of women in labor escaping or causing harm to themselves, the public, security guards, or medical staff.[9] Since New York City jails restricted the use of restraints on inmates admitted for delivery in 1990, there have been no reported incidents of escape or harm to medical staff.[10]

145.     In 2011, the United States Department of Justice convened a task force to address the use of restraints on pregnant women in custody. Its 2014 final report concluded that "[t]he use of restraints on pregnant women and girls under correctional custody should be limited to absolute necessity . . . when there is an imminent risk of escape or harm . . . . and these risks cannot be managed by other reasonable means . . . ."[11]

146.     In 2008, the Federal Bureau of Prisons mandated that restraints not be used on women during labor, delivery, or post-delivery recuperation absent compelling circumstances.[12]

147.     Given the myriad complications that can result from the shackling of pregnant women, 22 states and the District of Columbia have adopted laws banning or severely limiting the use of any form of restraints on pregnant women.[13]

---

[9] *ACLU Briefing Paper* at 5.

[10] *Id.*

[11] NAT'L TASK FORCE ON THE USE OF RESTRAINTS WITH PREGNANT WOMEN UNDER CORRECTIONAL CUSTODY, BEST PRACTICES IN THE USE OF RESTRAINTS WITH PREGNANT WOMEN AND GIRLS UNDER CORRECTIONAL CUSTODY 6 (2014); *see also* United States Marshal Service, Policy 9.1 (Restraining Devices), § (D)(3)(e),(h).

[12] Fed. Bureau of Prisons, *Escorted Trips* §570.45(9)

[13] Ginnette G. Ferszt, Michelle Palmer, & Christine McGrane, *Commentary: Where Does Your State Stand on Shackling of Pregnant Incarcerated Women?*, 22 Nursing for Women's Health J. 17, 18 (2018).

148.     New York was part of this movement; in 2009, the state legislature passed the Anti-Shackling Law, which banned the shackling of pregnant women during labor and childbirth. *See* N.Y. Corr. Law § 611 (2009).

149.     In 2015, the New York state legislature amended the Anti-Shackling Law to bar the use of *any* form of restraints on women during *any* stage of pregnancy, labor, or an eight-week post-partum recovery period. The statute permits "wrist restraints" shackling only in the most "extraordinary" circumstances for a pregnant woman, and it prohibits *all* restraints "when such woman is in labor, admitted to a hospital, institution or clinic for delivery, or recovering after giving birth." N.Y. Corr. Law § 611(1(a)-(b).

150.     As an African American woman, Ms. Doe is three times more at risk for maternal mortality than white mothers in labor as reported by the Centers for Disease Control. By shackling Ms. Doe during labor and after delivery, the defendants further exasperated Ms. Doe's and Baby Doe's risk for mortality.

**G.     The City Is Repeatedly Sued for the NYPD's Illegal Shackling of Pregnant Women**

151.     On July 25, 2015, NYPD officers in the Bronx arrested a woman who was 35 weeks pregnant at the time. NYPD officers transported her to the hospital when she experienced a medical crisis, and then kept the woman in shackles for 72 hours while she was hospitalized.

152.     On September 28, 2016, the woman sued the City and several Bronx NYPD officers for violations of her constitutional rights. *See* Index No. 303220/16. The City settled her suit on May 30, 2017.

153.     On February 7, 2018, NYPD officers in the Bronx arrested another woman who was 40 weeks pregnant for a misdemeanor related to a September 2017 family dispute with her ex-partner. For thirty hours—before, during, and after her labor and delivery of her baby

daughter—the NYPD shackled the woman using a combination of metal handcuffs at her wrists and metal cuffs at her ankles.

154.     On December 6, 2018, ten days before the events underlying this lawsuit, the woman sued the City and several Bronx NYPD officers for violations of her constitutional rights. *See* No. 18 Civ. 11414 (S.D.N.Y. Dec. 6, 2018).[14] On July 1, 2019, the City settled her suit for $610,000.[15]

155.     Following the resolution of the lawsuit, the NYPD issued the following statement, according to news reports: "The NYPD anticipates amending its patrol guide to better address safety and medical concerns associated with arrestees in late stages of pregnancy as well as the exceptional circumstance of safeguarding an arrestee through child birth and until their arraignment."

156.     On January 29, 2020, the NYPD issued revised language in its Patrol Guide regarding "Restraint of Pregnant Prisoners." These revisions still fail to comply with state law or basic and sound correctional and medical practices, and do not adequately protect the safety of the mother and child.

**H.     Plaintiff Files a Notice of Claim**

157.     On August 7, 2019, Ms. Doe, on behalf of herself and her infant son, filed a petition for leave to file a late notice of claim in the Supreme Court of the State of New York, Kings County, pursuant to General Municipal Law § 50-e(5).

---

[14] *See* Ashley Southall & Benjamin Weiser, *Police Forced Bronx Woman to Give Birth While Handcuffed, Lawsuit Says,* N.Y. Times, Dec. 6, 2018, https://www.nytimes.com/2018/12/06/nyregion/pregnant-inmate-shackled-lawsuit.html.

[15] *See* Ashley Southall, *She Was Forced to Give Birth in Handcuffs. Now Her Case Is Changing Police Rules*, N.Y. Times, July 3, 2019, https://www.nytimes.com/2019/07/03/nyregion/nypd-pregnant-women-handcuffs.html.

158.	On November 22, 2019, Justice Katherine Levine granted Ms. Doe's petition.

159.	On November 26, 2019, the Notice of Claim was served on the New York City Comptroller.

160.	 A hearing on this notice was held pursuant to General Municipal Law § 50-h on March 9, 2020.

161.	This action has been commenced within one year and ninety days of Ms. Doe's shackling from December 17-19, 2018.

## FIRST CAUSE OF ACTION
42 U.S.C. § 1983 – Fourth and Fourteenth Amendments
Deliberate Indifference to Serious Medical Needs/Substantive Due Process/Excessive Force
(Against All Defendant Officers)

162.	Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

163.	At all relevant times, Defendant Officers were acting under color of state law in their individual and official capacities within the scope of their respective employments as police officers for the New York City Police Department.

164.	At all relevant times, Plaintiff's late-stage pregnancy, labor, delivery, and post-partum recovery were serious medical needs.

165.	At all relevant times, New York law expressly prohibited the use of any form of restraints on a pregnant woman in labor, in the hospital, or on a woman who has recently given birth.

166.	At all relevant times, Plaintiff was either nine months pregnant, in labor, in the hospital, and/or had just given birth.

167.     At all relevant times, there was no medical, legal, security, or other need to use restraints on Plaintiff.

168.     At all relevant times, medical and correctional experts agreed that the use of shackles on a pregnant woman during transport, labor, delivery, in the hospital, or post-partum recovery creates significant risk and danger to both the woman and the child.

169.     By failing to offer and/or provide timely access to medical attention to Plaintiff while she was in labor at the 75th Precinct, shackling Plaintiff, approving of such restraints, and/or failing to intervene to prevent the use of such restraints over the course of her arrest, transport, detention, and hospitalization, Defendant Officers placed Plaintiff and her unborn and then-infant child at serious risk for potentially life-threatening complications and were deliberately indifferent to Plaintiff's serious medical needs.

170.     By failing to offer and/or provide timely access to medical attention to Plaintiff while she was in labor at the 75th Precinct, shackling Plaintiff, approving of such restraints, conducting a sexually abusive and invasive "inspection" of Plaintiff's vaginal area, and/or failing to intervene to prevent the use of restraints over the course of her arrest, transport, detention, and hospitalization, Defendant Officers engaged in outrageous and conscience-shocking conduct.

171.     By shackling Plaintiff, approving of such restraints, conducting a sexually abusive and invasive "inspection" of Plaintiff's vaginal area, and/or failing to intervene to prevent the use of such restraints over the course of her arrest, transport, detention, and hospitalization, Defendant Officers used excessive, brutal, sadistic and unconscionable force on Plaintiff.

172.     Defendants acted beyond the scope of their authority and jurisdiction to willfully, knowingly, and intentionally deprive Plaintiff of her constitutional rights secured by 42 U.S.C. § 1983 including, but not limited to, rights guaranteed by the Fourth and Fourteenth Amendments.

173.     As a direct and proximate result of Defendant Officers' misconduct detailed above, Plaintiff sustained the damages hereinbefore alleged.

**SECOND CAUSE OF ACTION**
42 U.S.C. § 1983 – Fourth and Fourteenth Amendments
Deliberate Indifference to Serious Medical Needs/Substantive Due Process/Excessive Force
(Against Defendant City)

174.     Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

175.     In the course of shackling Plaintiff, Defendant Officers cited variously to a "policy" or "protocol" which they were following. Defendant Officers told medical professionals that they were required to use restraints by this "policy," "procedure," or "protocol."

176.     Defendant City, through its policymakers within the NYPD, explicitly or tacitly approved the unconstitutional practice described above. In maintaining the "policy" or "protocol" regarding the use of restraints on pregnant women, the City was deliberately indifferent to the constitutional rights of pregnant women generally, and Plaintiff specifically.

177.     Defendant City was aware of and deliberately indifferent to the fact that its "policy" or "protocol" would result in the deprivation of Plaintiff's and others' constitutional rights. At all relevant times, Defendant City was aware that the use of shackles on pregnant women is proscribed by state statute.

178.     Defendant Officers acted consistently with and pursuant to the "policy" or "protocol" when they engaged in the conduct set forth above.

179.    Alternatively, Defendant City failed to adequately train Defendant

Officers on the legal proscription against shackling pregnant women, women in labor, or women

who have just given birth.

180.    Defendant City's failure to train Defendant Officers directly caused

Defendant Officers to shackle Ms. Doe and express the belief that the NYPD Patrol Guide

supersedes state law.

181.    Defendant City was deliberately indifferent to the need for such training,

as evidenced in part by two prior lawsuits about the NYPD 's unconstitutional shackling of a

pregnant woman, one of which had been filed ten days earlier, and by the numerous Defendant

Officers who believed the shackling of Ms. Doe was justified.

182.    Defendant City, acting under color of state law, violated Plaintiff's rights

under the Fourth and Fourteenth Amendment to the United States Constitution.

183.     As a direct and proximate result of Defendant City's "policy,"

"procedure," or "protocol," or as a result of Defendant City's failure to train its officers, Plaintiff

sustained the damages hereinbefore alleged.

### THIRD CAUSE OF ACTION
42 U.S.C. § 1983 – Fourth Amendment
False Arrest
(Against Defendant Franco)

184.    Plaintiff repeats and realleges the above paragraphs as if they were fully

set forth at length herein.

185.    By the actions described above, by detaining Plaintiff based only on the

2017 I-Card, Defendant Franco falsely arrested, unreasonably seized, falsely imprisoned, and

detained Plaintiff.  The wrongful, unjustifiable, and unlawful apprehension, arrest, seizure, and

detention of Plaintiff was carried out with any basis, without Plaintiff's consent, and without reasonable suspicion or probable cause.

186.   Defendant Franco knew he lacked probable cause to arrest/unreasonably seize Plaintiff on December 17, 2018 based on the 2017 I-Card because he was not involved in the investigation of the allegations underlying the 2017 I-Card, he had no knowledge of the facts underlying the 2017 I-Card, he had not communicated with any other officer concerning facts that could give rise to probable cause to arrest, and/or because he had not taken any other steps to verify the information on the I-Card, which had been generated more than a year before the arrest and had remained dormant since that time.

187.   No reasonable officer would have believed there was probable cause to arrest/unreasonably seize Plaintiff under these circumstances.

188.   From the time Defendant Franco arrested Plaintiff upon her release with no bail set from Manhattan Criminal Court, until officers from the 75th Precinct took her into their custody, Plaintiff was unlawfully, wrongfully, and unjustifiably held under arrest, unreasonably seized, and deprived of her liberty.  During that period, the unlawful, wrongful, and false arrest/unreasonable seizure of Plaintiff was without basis and without probable cause or reasonable suspicion.

189.   Defendant Franco deliberately undertook these actions and his misconduct occurred without any fault or provocation on the part of Plaintiff.

190.   Defendant Franco acted under pretense and color of state law. Defendant Franco acted in abuse of his powers and beyond the scope of his authority and jurisdiction to willfully, knowingly, and intentionally deprive Plaintiff and of her constitutional rights secured

by 42 U.S.C. § 1983, and by the Fourth and Fourteenth Amendments to the United States Constitution.

191.    As a direct and proximate result of Defendant Franco's misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

**FOURTH CAUSE OF ACTION**
New York Correction Law § 611
Unlawful Use of Restraints
(Against Defendant City and Defendants Mcaleese, Richards, Agront, Ali, and John Joe 2)

192.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

193.    At all relevant times, Defendants Mcaleese, Richards, Agront, Ali, and John Joe 2 knew that Plaintiff was pregnant, in labor, admitted to a hospital for delivery, within eight weeks of giving birth, or recovering after giving birth to her daughter.

194.    At all relevant times, Plaintiff was "confined" in an institution as described in the New York Correction Law § 611.

195.    At all relevant times, Defendants Mcaleese, Richards, Agront, Ali, and John Joe 2 used restraints on Plaintiff while she was transported to different locations, while she was in labor, while she was admitted to the hospital for delivery and while she was recovering from giving birth.

196.    At no point did Plaintiff pose any risk of flight or of any injury to anyone.

197.    Defendants Mcaleese, Richards, Agront, Ali, and John Joe 2 acted under pretense and color of state law. Defendants Mcaleese, Richards, Agront, Ali, and John Joe 2 acted beyond the scope of their authority and jurisdiction to willfully, knowingly, and intentionally deprive Plaintiff of her statutory rights.

198.     As a direct and proximate result of the misconduct and abuse of conduct of Defendants Mcaleese, Richards, Agront, Ali, and John Joe 2, as detailed above, Plaintiff sustained the damages hereinbefore alleged.

## FIFTH CAUSE OF ACTION
Assault
(Against City Defendant and Defendants Kulick, Mcaleese, Richards, Agront, Ali, and John Joe 2)

199.     Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

200.     By reason of the foregoing, and by threateningly approaching Plaintiff and aiming to unlawfully apply restraints to her, Defendants Kulick, Mcaleese, Richards, Agront, Ali, and John Joe 2, acting in their capacity as NYPD officers and within the scope of their employment as such, intentionally placed Plaintiff in apprehension of imminent offensive contact and displayed the ability to effectuate such contact, and thereby committed a willful, unlawful, unwarranted, and intentional assault upon Plaintiff.

201.     By reason of the foregoing, and by Defendant Kulick's conducting a sexually abusive and invasive "inspection" of Plaintiff's vaginal area, Defendants Kulick, Mcaleese, Richards, Agront, Ali, and John Joe 2, acting in their capacity as NYPD officers and within the scope of their employment as such, committed a willful, unlawful, unwarranted, and intentional assault upon Plaintiff.

202.     The assaults committed by Defendants Kulick, Mcaleese, Richards, Agront, Ali, and John Joe 2 were unnecessary and unwarranted in the performance of their duties as NYPD officers and constituted an unreasonable use of restraints.

203.     Defendant City, as employer of Defendants Kulick, Mcaleese, Richards, Agront, Ali, and John Joe 2, is responsible for the wrongdoing of Defendants Kulick, Mcaleese, Richards, Agront, Ali, and John Joe 2 under the doctrine of respondeat superior.

204.     As a direct and proximate result of the misconduct and abuse of Defendants Kulick, Mcaleese, Richards, Agront, Ali, and John Joe 2, as detailed above, Plaintiff sustained the damages hereinbefore alleged.

**SIXTH CAUSE OF ACTION**
Battery
(Against City Defendant and Defendants Kulick, Mcaleese, Richards, Agront, Ali, and John Joe 2)

205.     Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

206.     By reason of the foregoing, and by restraining Plaintiff's hands and legs, Defendants Kulick, Mcaleese, Richards, Agront, Ali, and John Joe 2, acting in their capacity as NYPD officers and within the scope of their employment as such, committed a willful, unlawful, unwarranted, and intentional battery upon Plaintiff.

207.     By reason of the foregoing, and by Defendant Kulick's conducting a sexually abusive and invasive "inspection" of Plaintiff's vaginal area, Defendants Kulick, Mcaleese, Richards, Agront, Ali, and John Joe 2, acting in their capacity as NYPD officers and within the scope of their employment as such, committed a willful, unlawful, unwarranted, and intentional battery upon Plaintiff.

208.     The batteries committed by Defendants Kulick, Mcaleese, Richards, Agront, Ali, and John Joe 2 were unnecessary and unwarranted in the performance of their duties as NYPD officers and constituted an unreasonable use of restraints.

209.     Defendant City, as employer of Defendants Kulick, Mcaleese, Richards, Agront, Ali, and John Joe 2, is responsible for the wrongdoing of Defendants Kulick, Mcaleese, Richards, Agront, Ali, and John Joe 2 under the doctrine of respondeat superior.

210.     As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

**SEVENTH CAUSE OF ACTION**
Intentional Infliction of Emotional Distress
(Against All Defendants)

211.     Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

212.     Defendant Officers engaged in extreme and outrageous conduct in applying restraints to Plaintiff's arms and legs notwithstanding the fact of her pregnancy.

213.     In shackling Plaintiff, Defendant Officers ignored the clear risk of harm to Plaintiff and her daughter, and they ignored the express warnings of numerous medical professionals.

214.     Defendant Officers intended to cause Plaintiff severe emotional distress or disregarded the substantial likelihood that their use of restraints would cause Plaintiff such distress.

215.     As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged, including but not limited to severe emotional distress.

216.     Defendant City, as employer of Defendant Officers, is responsible for Defendant Officers' wrongdoing under the doctrine of respondeat superior.

## EIGHTH CAUSE OF ACTION
New York City Human Rights Law
(Against All Defendants)

217.     Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

218.     Defendants engaged in unlawful discrimination against Plaintiff because of her gender in violation of N.Y.C. Admin. Code § 8-107(1).

219.     Defendants engaged in unlawful discrimination against Plaintiff because of her pregnancy in violation of N.Y.C. Admin. Code §§ 8-107(1) and 8-107(22).

220.     As a result of Defendants' discrimination against Plaintiff on the basis of her gender and pregnancy, Plaintiff is entitled to compensatory damages and to attorneys' fees and costs under N.Y.C. Admin. Code § 8-120(a).

221.     Defendants' actions in violation of the New York City Human Rights Law were intentional, with malice, and/or showed deliberate, willful, wanton, and reckless indifference to Plaintiff's civil rights, for which she is entitled to an award of punitive damages.

222.     Plaintiff has not filed any other civil or administrative action alleging an unlawful discriminatory practice with respect to the allegations of discrimination which are the subject of this Complaint.

WHEREFORE, Plaintiff respectfully requests judgment against Defendants as follows:

a.  Compensatory damages against all Defendants in an amount to be determined at trial;

b.  Punitive damages against Defendant Officers in an amount to be determined at trial;

c. A declaration that the NYPD's policy or custom of shackling pregnant arrestees during transportation, labor, delivery, or recovery violates the United States Constitution and New York State law;

d. Injunctive relief against the City of New York, including but not limited to ordering the NYPD to issue policies, training, and procedures prohibiting the shackling of pregnant women during transportation, labor, delivery and postpartum recuperation;

e. Reasonable attorneys' fees and costs under 42 U.S.C. § 1988 and N.Y.C. Admin. Code § 8-120(a); and

f. Such other and further relief as this Court may deem just and proper.

Dated:  New York, New York
        October 27, 2020

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP

By: _____/s/_____

Katherine Rosenfeld
Andrew K. Jondahl
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000


THE LEGAL AID SOCIETY

By: _____/s/_____

Anne Oredeko
Anthony Posada
Corey Stoughton
199 Water Street 6th floor
New York, New York 10038
(212) 577-3300

*Attorneys for Plaintiff*
